J-A13003-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| CHRISTINA STONE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ERIC STONE | : | |
| | : | |
| Appellant | : | No. 96 EDA 2021 |

Appeal from the Order Entered November 24, 2020
In the Court of Common Pleas of Bucks County Civil Division at No(s):
No. A06-2018-60780-C

BEFORE:   BENDER, P.J.E., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:              **FILED AUGUST 16, 2021**

Eric Stone ("Father") appeals *pro se* from the November 24, 2020 order, which awarded Christina Stone ("Mother") and Father joint legal custody of H.S. (born in January of 2012), J.S. (born in December of 2013), and S.S. (born in July of 2016) (collectively "Children" or "the Stone Children"), except that Mother was granted sole legal custody of Children with respect to psychological or psychiatric issues.  The order further awarded Mother primary physical custody of Children, subject to Father's limited partial physical custody rights in accordance with a schedule delineated in the order.  After careful review, we affirm.

Mother and Father married in October of 2011.  They had three Children together, before separating in October of 2017.  Their divorce was finalized

_____

[*] Former Justice specially assigned to the Superior Court.

on October 9, 2019. This was Father's first marriage. Mother was previously married for two years but did not have any prior children. Mother is a nurse practitioner, employed in the area of Trenton, New Jersey. She is not currently in a relationship and resides in the Pennsbury School District.

Father has a master's degree in geology and works for an environmental company in Newark, Delaware. He remarried in July of 2020 to Lisa McClain ("Ms. McClain"). Ms. McClain has three children from a prior marriage to Carlos Leiva: J.L. (11 years old), T.L. (9 years old), and J.L. (7½ years old) (collectively "the McClain Children"). Father and Ms. McClain currently live in the Neshaminy School District and are the parents of P.S. (born in February of 2020).[1]

On May 21, 2018, a stipulated consent order was filed by the trial court, which awarded Mother and Father shared legal custody of Children, and awarded Mother primary physical custody of Children, subject to Father's partial physical custody. *See* Trial Court Order ("Custody Order"), 5/21/18, at 1-3. Pursuant to the Custody Order, Father had custody every Monday and Thursday evening following Mother's custodial weekends, after work until 7:30 p.m., and on alternate weekends. *Id.* at 1-2 ¶¶ 4-5. The order also permitted each party to have two, non-consecutive weeks' vacation with Children per year and provided for an alternating holiday schedule. *Id.* at 2-3 ¶¶ 6-12.

---

[1] P.S. is excluded from any reference to the McClain Children herein.

Father filed a petition to modify the Custody Order in September of 2018, in which he sought shared physical custody of Children. Father averred that he was moving into a three-bedroom apartment and that it would be in Children's best interest to spend an equal amount of time with both parents, especially when the parties live in close proximity to each other. *See* Petition to Modify Custody Order, 9/6/18, at 2. A custody conference was held on October 11, 2018, at which time the Master recommended that the parties participate in a custody evaluation with Court Conciliation and Evaluation Service ("CCES"). A custody hearing was scheduled for January 17, 2019, and continued to February 8, 2019. At the continued custody hearing, the parties agreed to participate in Bucks County's CCES program. They completed the CCES evaluation on July 15, 2019. On October 7, 2019, Father filed a motion requesting an expedited custody hearing, as the parties were unable to reach an agreement during the CCES process.

On December 3, 2019, Mother filed an emergency petition to modify the Custody Order, in which she averred Father secretly moved his paramour, Ms. McClain, and the McClain Children into his three-bedroom apartment. Mother sought to have Father found in contempt of the Custody Order and to enjoin Father from allowing Children near the McClain Children, as Mother avers the living arrangement at Father's home had become physically dangerous and had created "extraordinary psychological turmoil" for the parties' Children. Emergency Petition to Modify Custody Order, 12/3/19, at 1-4 (unpaginated).

A hearing was scheduled for January 27, 2020, regarding both parties' emergency motions.

At the January 27, 2020 hearing, Mother's petition to modify the Custody Order was granted and an order was entered, which maintained joint legal custody of Children between the parties, but limited Father's partial physical custody to every Saturday from 10:00 a.m. to 6:00 p.m. The court further directed that the McClain Children were not permitted to be present during Father's visits with Children. The presiding judge indicated that this was meant as a temporary solution "for … a month or two … to let things calm down," and instructed Father to request a new hearing on his pending petition for a custody hearing. *See* N.T. Hearing, 1/27/20, at 236. In February of 2020, Mother filed a petition for contempt, which alleged that Father had violated the January 27, 2020 custody order by taking Children to see a movie where the McClain Children were also present. As a result, Mother sought a finding of contempt against Father and a further reduction in his partial physical custody of Children.

The trial court scheduled a custody hearing for April 3, 2020, which was then continued generally due to a judicial emergency declared in Bucks County as a result of the COVID-19 pandemic. On April 15, 2020, Mother filed an emergency petition for special relief and an amended petition for contempt. An emergency custody conference was held via telephone on May 5, 2020, during which the parties were notified that a notice of hearing would be mailed when hearing dates became available. A custody hearing was held on August

- 4 -

25, 2020, at which Mother presented witnesses and exhibits. The court was forced to adjourn due to time constraints; thus, the hearing was continued on October 14 and October 21, 2020.

After taking into consideration the testimony and evidence presented by both parties, the trial court entered an order dated November 24, 2020, awarding the parties joint legal custody of Children, except that Mother was granted sole legal custody of Children with respect to psychological or psychiatric issues. *See* Trial Court Order ("Modified Custody Order"), 11/24/20, at 1 ¶ 1. Additionally, the Modified Custody Order awarded Mother primary physical custody of Children, subject to Father's partial physical custody every Wednesday from 4:30 p.m. to 6:30 p.m., and every other Saturday from 11:00 a.m. to 1:00 p.m. During the months of May through October, when Children's paternal grandmother is at her home in Bayville, New Jersey, Father is permitted to take Children to his mother's home on any Saturday that he would normally have custody, in which case his custody is expanded from 9:00 a.m. to 8:00 p.m. *Id.* at 1-2 ¶¶ 2-3. Father is not permitted any scheduled vacation time with Children. *Id.* at 3 ¶ 5. Mother is permitted to take vacations during her custody time and, in addition, may take a vacation with Children that causes Father to miss up to two of his Wednesday dinner visits per year. *Id.* Mother shall have custody of Children during all holidays, except from 11:00 a.m. to 2:00 p.m. on Father's Day, and from 11:00 a.m. to 1:00 p.m. on Christmas Day. *Id.* at 3 ¶ 6. The Modified Order further states: "At no time shall … Children be in the presence of the

- 5 -

three older McClain [C]hildren…. Father may have P.S. present on any of his partial custody times." *Id.* at 4 ¶9.

On December 23, 2020, Father filed a timely, *pro se* notice of appeal, followed by a timely, court-ordered Pa.R.A.P. 1925(b) concise statement of errors on appeal.[2]

> As a prefatory matter, although this Court is willing to construe liberally materials filed by a *pro se* litigant, *pro se* status generally confers no special benefit upon an appellant. Accordingly, a *pro se* litigant must comply with the procedural rules set forth in the Pennsylvania Rules of the Court. This Court may quash or dismiss an appeal if an appellant fails to conform with the requirements set forth in the Pennsylvania Rules of Appellate Procedure. [***See***] Pa.R.A.P. 2101.

***Commonwealth v. Freeland***, 106 A.3d 768-77 (Pa. Super. 2014) (case citations omitted).

---

[2] We note with disapproval that Father's 13-page Rule 1925(b) statement is anything but concise, in contravention of our Rules of Appellate Procedure. ***See*** Pa.R.A.P. 1925(b)(4)(ii), (iv) (providing that the statement "shall concisely identify each error that the appellant intends to challenge" and "should not be redundant or provide lengthy explanations as to any error"); ***Karn v. Quick & Reilly Inc.***, 912 A.2d 329, 335 (Pa. Super. 2006) (stating that the failure to comply with Rule 1925(b)(4) may result in waiver of all issues, particularly where the trial court is impeded in its preparation of a legal analysis of the issues) (citing Pa.R.A.P. 1925(b)(4)(vii)). Father's lengthy statement contains unnecessary procedural history, as well as the development of argument and presentation of evidence pertaining to each of the issues Father intended to raise on appeal. Nevertheless, we decline to waive the issues actually raised on these grounds, as we do not believe the trial court's ability to identify and address the issues raised was impeded to an extent that warrants such a drastic result. ***See McGavitt v. Guttman Realty Co.***, 909 A.2d 1, 4 (Pa. Super. 2006) (declining to waive the appellant's issues on appeal where, despite a lengthy Rule 1925(b) statement containing superfluous discussion, the trial court was not precluded from conducting a comprehensive analysis of the issues raised).

Instantly, Father failed to include a statement of questions involved in his brief, as required by Pa.R.A.P. 2116(a).[3]  Rule 2116(a) "is to be considered in the highest degree mandatory, admitting of no exception; ordinarily no point will be considered which is not set forth in the statement of questions involved or suggested thereby."  **Wirth v. Commonwealth**, 95 A.3d 822, 858 (Pa. 2014) (quoting **Commonwealth v. Miller**, 424 A.2d 531, 533 (Pa. Super. 1981)).  Therefore, it would be within the province of this Court to dismiss the claims raised in the argument section of Father's brief.  However, in the interest of justice, we will address the arguments that we can reasonably discern from the itemized points in the argument section of the brief.  **See Freeland**, 106 A.3d at 777 (addressing the arguments that can be reasonably discerned from the appellant's brief "in the interest of justice," despite substantial defects in the brief).[4]

_____

[3] Rule 2116(a) provides:

> The statement of the questions involved must state concisely the issues to be resolved, expressed in the terms and circumstances of the case but without unnecessary detail.  The statement will be deemed to include every subsidiary question fairly comprised therein.  No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby.

Pa.R.A.P. 2116(a).

[4] We further note that Father's brief fails to substantially comply with our Rules of Appellate Procedure, in that the brief does not include (1) a statement of jurisdiction; (2) a copy of the order in question; (3) statements of the scope and standard of review; (4) a copy of the Rule 1925(b) statement; and (5) a copy of the lower court opinion.  **See** Pa.R.A.P. 2111(a)(1)-(3), (10), (11);
*(Footnote Continued Next Page)*

In his brief, Father essentially claims that the trial court erred in awarding Mother sole legal custody of Children regarding psychological and psychiatric issues, further reducing his partial physical custody of Children, and directing that Children shall at no time be in the presence of the McClain Children. Father's Brief at 5-7. In reviewing a custody order, our scope is of the broadest type, and our standard is abuse of discretion.

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it…. However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination…. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings[] and[,] thus, represent a gross abuse of discretion.
>
> Moreover, on issues of credibility and weight of the evidence, we defer to the findings of the trial court who has had the opportunity to observe the proceedings and demeanor of the witnesses.

---

Pa.R.A.P. 2114, 2115. Father's brief also fails to comply with Rule 124(a)(4), which provides that the lettering shall be "no smaller than 14 point in text and 12 point in footnotes." Pa.R.A.P. 124(a)(4). *See also* Pa.R.A.P. 2135(c) ("Size and other physical characteristics of briefs shall comply with Pa.R.A.P. 124."). This Court is empowered to quash or dismiss an appeal where the defects in the appellate brief are substantial. *See* Pa.R.A.P. 2101. Despite Father's blatant disregard for our Rules of Appellant procedures, these infractions do not affect our ability to conduct a meaningful appellate review; thus, we decline to dismiss this appeal. *See Commonwealth v. Henry*, 706 A.2d 313, 318 n.4 (Pa. 1997) (admonishing counsel for filing a brief in contravention of various rules of appellate procedure, but determining that appellate review was not impeded); *Long v. Ostroff*, 854 A.2d 524, 527 (Pa. Super. 2004) (declining to quash the appeal where numerous defects in the appellant's brief did not prevent meaningful review).

The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion. The test is whether the evidence of record supports the trial court's conclusions.

***A.V. v. S.T.***, 87 A.3d 818, 820 (Pa. Super. 2014) (internal citations omitted).

When making a decision that involves custody, the trial court must consider the following sixteen custody factors set forth in Section 5328 of the Child Custody Act (23 Pa.C.S. §§ 5321-5340):

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a). *See A.M.S. v. M.R.C.*, 70 A.3d 830, 836 (Pa. Super. 2013). The trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S. § 5323(d). "In expressing the reasons for its decision, there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *A.V.*, 87 A.3d at 823 (internal citation omitted). "A

- 10 -

court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d)." *Id.*

Here, the trial court issued an opinion in support of its Modified Custody Order, which included a thorough, eleven-page analysis of the foregoing custody factors. *See* Trial Court Opinion ("TCO"), 11/24/20, at 2-12. Of the sixteen factors, the trial court determined that nine of the factors favored Mother, *i.e.*, (a)(1)-(5), (7), (9), (10), and (12), and that six of the factors were either neutral or not applicable, *i.e.*, (a)(8), (11), (13)-(16). Only one factor was found to favor Father, *i.e.*, (a)(6), in that Children's half-sibling, P.S., lives with Father. *Id.* Based on our review, the evidence of record supports the trial court's decision to grant Mother primary physical custody and sole legal custody of Children with respect to psychological or psychiatric issues.

Father argues, however, that the "separation of siblings" resulting from the Modified Custody Order is unwarranted and is not in the best interests of Children. Father's Brief at 5-6. He claims that Children did not get hurt during sleepovers at his house, that the majority of Children's injuries presented at the hearing were not caused by the McClain Children, that J.L. "has never roughhoused" with Children, and that the judge unfairly considered the McClain Children's ages and weights in her decision. *Id.* Moreover, Father claims that the trial court "completely discredited the … CCES evaluation[,]" which recommended that physical custody remain similar to that provided for in the original Custody Order. *Id.* at 5. He further asserts that H.S.'s anxiety

is not caused by seeing him. Rather, he states that Children "are happy to see [him] and spend time with [him]." *Id.* at 6. Father insists that he has been "in regular communication with [H.S.'s] therapist and [J.S.'s] developmental doctors." *Id.* Finally, he claims that Children have a strong bond with P.S. and a loving relationship with their stepmother, Ms. McClain. He requests this Court overrule any limitation placed on Children's spending time with their step-brothers, their step-mother, and their younger sibling, P.S. *Id.* at 6-7.

Father is essentially asking us to reject the trial court's findings and credibility determinations, which we cannot do. Rather,

> [w]e must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand.

*J.R.M. v. J.E.A.*, 33 A.3d 647, 650 (Pa. Super. 2011). Based on our review of the record, we discern that, while taking into account Children's best interests, the trial court carefully considered all of the statutorily mandated factors in arriving at its custody determination, that its findings are supported by the record, and that it adequately explained the basis for its decision. *See* 23 Pa.C.S. § 5323(d); *A.V.*, 87 A.3d at 823.

Contrary to Father's assertions, it is clear that the trial court took into consideration the CCES Report dated August 27, 2019, and that it acknowledged the report's recommendation that the parties continue to have

- 12 -

a custody schedule similar to the original Custody Order. *See* TCO at 3 (noting that the CCES Report included Mother's concerns regarding Father's parenting ability, particularly regarding the issue of Children's safety). Of particular interest to the court, in light of more recent events, was the following:

> Mother told the custody evaluator in 2019[] that "Father has [a] difficult time relating to … Children. She said that he appears as being without emotion and not being empathetic…[.] Father does not acknowledge that [H.S.] had problems with anxiety and that [J.S.], who is in speech therapy, has a developmental issue. Mother feels that Father's judgment is not good…[.] When Father got mad at Mother at [H.S.'s] skating recital, he was going to remove [H.S.] from participating in the skating recital while the skating recital was already in progress."

> At the hearing we held on January 27, 2020, and later hearings in 2020, we found that Mother's description of Father's faults, such as not good parenting skills, lack of empathy, lack … of acknowledgment of … Children's issues, and misdirection of his anger at Mother, were accurate descriptions of problems with Father's behavior. In addition, in the courtroom, he sat very still and, principally, just stared at the bench. It was more of a blank stare than a hostile stare. Father told the evaluator that he wanted 50-50 custody, he thinks "he is an excellent father…," and he puts … Children's needs first. At the hearing on January 27, 2020, and all subsequent hearings, we did not find that he was an excellent Father who put his Children first.

*Id.* at 3-4 (citations to records and brackets omitted).

Additionally, the court emphasized that prior to the McClain Children's moving into Father's home, the parties adhered to the Custody Order without much trouble. However, after the McClain family moved into Father's residence, the court noted numerous incidents which demonstrated Father's poor parenting skills:

1. Father agreed that Mother could take … Children to a dance recital in December [of] 2019…. Children had costumes, were looking forward to the recital, and had been rehearsing since September.  Mother went to pick up … Children at Father's [home.]  (It was his weekend[.)] [] Children were not there[,] and Father did not answer his cellphone.  [] Children missed the recital[,] and it was only several hours later that the paternal grandmother contacted Mother and said … Children were fine.  Apparently, they had gone to see Santa Claus with [Ms.] McClain and [the McClain C]hildren.  When Father testified on October 21, 2020, he indicated that he was upset at Mother because she had not given him make-up dates with … Children from when [he] was sick.  He said Mother was checking her schedule.  Nothing in the [Custody] Order required make-up time.  This is an example … of Father['s] being annoyed at Mother and taking it out on Children.  It was outrageous that he would not even answer Mother's call and say … Children were not going to the recital.  Mother testified that … Children were very upset.

2. Ryan Resnick, the manager of a pet store, testified on August 25, 2020, to the behavior of Father and … Children in the store.  Basically, … Children ran around the aisles uncontrolled for about 45 minutes while Father tried to contain them.  Mr. Resnick said he never saw children so out of control.  Mother said that Father has never known how to handle … Children.  This incident occurred after January 27, 2020, when we reduced Father's time.  Clearly, he did not know what to do with his Children when the McClain [C]hildren were at his house and he could not take [them there].  This is one of the reasons we are reducing his time.

3. Clothing—Mother had complained that Father did not return the clothes she sent with … Children and that he sometimes sent other clothing.  Father then began the practice of taking the clothes he was returning, spreading them out in front of Mother's house, taking a picture of them, and then putting them in a bag at Mother's door.  Mother said … [C]hildren were upset by this procedure.  In our [Modified] Order, we have stopped this practice.

4. Father took … [C]hildren to the movies … at some point after we entered our January 27, 2020[] Order prohibiting contact between the Stone Children and the McClain [C]hildren.  The McClain [C]hildren were in the same theater with their paternal

grandfather, very close to the Stone Children. Father did not ask the McClains to move, nor did he move his Children. There was apparently no overt incident, but we believe Father was deliberately pushing the line or was over the line with respect to the directive in our January 27, 2020[] Order[, which] states that the McClain [C]hildren are not to be in the presence of the Stone Children.

5. Close before the time of the January 27, 2020[] hearing, [H.S.] had a complete meltdown at the end of a Friday school day. Michelle Scharf, the guidance counselor at Afton Elementary School, testified that she found [H.S.] in the hall, curled up in a fetal position. [H.S.] told her she did not feel safe at Father's, that she was going to be in a "time-out" all day, and that she had previously been kept in her room all day in a "time-out" except [for] going to the bathroom. She said that she was being punished for "pee and poop" accidents. Father dismissed her reaction to his sanction. Later, it developed in testimony that all [three] … Children were punished. We do not see how punishing Children will deal with the problem for such accidents. Father testified he thought their behavior was deliberate. We do not.

*Id.* at 4-6 (citations to record omitted).

The trial court further noted that when Children were interviewed by the custody evaluator prior to the McClain Children's spending overnights at Father's house, they were "very positive" about going to see Father. *Id.* at 7. Since the McClain Children started spending time at Father's home, however, the court made the following findings:

1. Valerie Allen, [Children's] nanny, testified that [H.S.] cries, is very anxious, and refuses to get into the car to go to Father's. She cries and sobs hysterically. [] Children say that "they are scared." They do not want to be in time-outs for hours and do not want to be "abused" by the McClain [C]hildren.

2. [J.S.] said that [T.L.] scratched him.

3. [J.S.] also said the McClain [C]hildren poured "pee" on the heads of the Stone Children. Father and [Ms. McClain] said it was

- 15 -

water and dismissed it as a prank, but Mother said … Children were upset.

4. Another incident at Father's house involved a knife (apparently a butter knife). A McClain child waived it around. Father and [Ms. McClain] again dismissed this as a mere prank[,] even though the Stone Children were scared.

5. On another occasion[,] Ms. Allen asked [J.S.] what happened to his lip. Father told Ms. Allen that [J.S.'s] lips were chapped, then Father said [J.S.] and [J.L.] were wrestling on the floor, and then Father said [J.S.] slipped and fell into the coffee table. When [J.S.] took off his hat, Ms. Allen saw "[J.S.'s] head was swollen and he had red bruises all over his head." [J.S.] explained that [T.L.] kicked him in the head seven times. [J.S.] was wearing a hat that covered the marks. Ms. Allen said [J.S.] does not usually wear a hat. This appeared to be the most serious injury.

6. In September, [H.S.] said she was stabbed by a pencil, but there was no mark. In October, [H.S.] was crying hysterically, holding her side, when she said she was pushed down the stairs by [J.L.] She later said she tripped. On October 24th or 25th [of] 2019, [H.S.'s] abdomen was mildly swollen.

*Id.* at 7-8 (citations to the record omitted).

Notably, the trial court stated that Father dismissed all the foregoing incidents "where the Stone Children received marks … as either being inflicted by one Stone child to another or [as] trivial." *Id.* at 8. The court added:

The incidents that have occurred in Father's home are not actually abuse[. T]hey are more negligence and lack of supervision. The behavior of Father (and [Ms. McClain]) has resulted in injuries, principally to [J.S.] Father blames his Children for causing the injuries to each other and Mother blames the McClain [C]hildren. Mother is correct. Moreover, [H.S.] wrote a note which said "daddy lied[.]" We agree.

[Ms. McClain] and her children started spending overnights with Father in July, 2019, and completely moved in with Father in January, 2020. It is very clear that the Stone Children did not have any injuries prior to their contact with the McClain [C]hildren. Moreover, they do not receive injuries at Mother's house. If the Stone Children were causing the injuries to each other, why do

- 16 -

they only receive injuries at Father's house?  The Stone [C]hildren appear to be considerable [*sic*] smaller than the McClain [C]hildren.  Father testified that [J.L.] was 5'4" and weighed 140 lbs.[,] whereas [J.S.] was 4'5" and weighed 80 lbs.  With this disparity in height and weight these boys should not even be roughhousing.

*Id.* at 8-9 (citations to record omitted).

Finally, the trial court opined:

This is an unusual custody matter since Father refuses to acknowledge there is any issue with [the McClain Children] and [believes] that, in fact, any problems are the fault of his own Children.  We did not find that to be the case.  Father and [Ms. McClain] were also adamant that the 3 older McClain [C]hildren had no place to go except to Father's and did not seem to understand that Father would then have very limited time with his own Children.  Given these constraints, we have tried to devise an [o]rder that, at least in the summer, will give Father what time we can.  We have not included [Ms.] McClain in Father's [p]atrial [c]ustody time.  She testified she had to watch her 3 older children.  We have to keep in mind the negative impact of the actions of the McClain [C]hildren with the Stone Children.

*Id.* at 12.  Having already determined that the trial court's findings are supported by the record, we deem its custody determination to be reasonable in light of these findings.  We discern no abuse of discretion or error of law.  Thus, Father is not entitled to any relief on his claims.

Accordingly, we affirm the trial court's November 24, 2020 Modified Custody Order and the custody schedule delineated therein.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/16/2021